TEXAS Co. *v.* MILLS.

(In Banc. Oct. 15, 1934.)

[156 So. 866. No. 31194.]

232

Watkins & Eager and **L. C. Hallam,** all of Jackson, and **Nichols & Huff,** of Forest, for appellant.

Percy M. Lee and **F. F. Mize**, both of Forest, for appellee.

**Smith, C. J.,** delivered the opinion of the court.

The appellee recovered a judgment against the appellant for damages from a personal injury for which he claims the appellant is responsible.

The record discloses that the appellant is a producer and wholesale dealer in petroleum products, and one of its bulk sales stations is at Walnut Grove, Miss. It is the lessee of the lot on which the station is located, and owns

the buildings, tanks, and other necessities for receiving and storing its products, and from which they are sold and distributed. A sign was displayed on the premises on which was painted the word ''Texaco,'' a trade-name of the appellant. It employed Glenn to operate this station under a contract, the pertinent parts of which are as follows:

## "Commission Agency Agreement.

"Agreement, dated —— between the Texas Company, a Delaware corporation, having an office and place of business at New Orleans, La. hereinafter called the Company and H. L. Glenn of Walnut Grove, Miss., hereinafter called the Agent, witnesseth:

"First: The Company hereby appoints the Agent, and the Agent hereby accepts the appointment as Agent for the Company at Walnut Grove, Miss. The Agent's surety bond will be Twenty-five Hundred Dollars ($2500.00).

"Second: The Agent's duties are hereby fixed by this agreement, the rules and practices of the Company, and by instructions issued by the Company from time to time.

"Third: The Agent shall:

"(1) Strictly observe and obey the Company's instructions and faithfully perform all duties connected with his agency.

"(2) Promptly, correctly and in strict accordance with Company's instructions, account for all Company moneys, goods, products, equipment, etc., in his possession, or coming into his custody, and pay the Company for any shortages which may develop at any time.

"(3) Sell the products of the Company for cash, or on credit properly authorized, and not exchange or agree to exchange the Company's products for property or merchandise for private use or account; personally pay the Company on demand (a) the sum due on any account

opened by him without authority, and (b) any portion of any credit account which has been sold in excess of the credit limit placed thereon by the Company. The Company shall not be under any obligation to make any attempt to collect such accounts nor to assign any part of such accounts to Agent until the Company shall have received full settlement thereof.

"(4) Neither (a) sell the Company's products, directly or indirectly, at less than Company's authorized prices, nor (b) enter into any secret agreements, contracts or understandings with any customer or competitor for the purpose of reducing the price of the product or controlling business.

"(5) Not use the Company's goods or funds in any way for private purposes and not cash out of the Company's funds personal checks for customers or other persons.

"(6) Not retain the amount of compensation due him from the Company from or as a charge against funds or any other property of the Company for which he is accountable.

"(7) Bear all expenses, except those mentioned in section '(3)' of Clause 'Fourth,' incident to the proper operation of the station covered by this agreement, including, without limiting the foregoing, (a) cost of painting, lettering and general maintenance of the bulk station facilities, service station facilities, trucks, miscellaneous equipment, when owned by the Agent; and (b) cost of handling and installing gasoline and lubricating oil pump and tank equipment, whether or not said equipment be owned by the Company, which installation and handling by the Agent, if the Company owns the equipment, shall in no manner affect the Company's title.

"(8) At his expense, furnish trucks and other equipment, when not supplied by the Company, in strict accordance with the Company's standards for such equipment.

"(9) At his expense, furnish all assistants and employes he may require for the proper and diligent operation of said station, and assume full direction and control over and responsibility for all such assistants and employes, and indemnify and save the Company harmless from loss arising out of or by virtue of all damage to properly and/or injury to persons (whether or not such injury result in death) occasioned by the acts of the Agent, his assistants and/or employes.

"(10) Not permit any assistant or employee or other person who is not of mature age and judgment to fill, handle, ship or deliver any refined oil or gasoline at or from the Agent's plant, store rooms or vehicles.

"(11) Not assign this agreement without the prior written consent of the Company.

"Fourth: The Company shall:

"(1) Have the right at its option to withhold any commissions, money or anything of value in its possession belonging to or due Agent, for the purpose of reimbursing itself for any amounts due hereunder from Agent at any time.

"(2) In event of termination of this agreement, have ninety days thereafter in which to remove its products and other properties from the premises the Agent owns or controls, and have the right to use the Agent's storage for a period of not exceeding three months upon payment of a rental of $—— per month for the period so used.

"(3) Pay (a) freight on products shipped, (b) license fees assessed for operation of main station and (c) taxes on Company's merchandise, stock and equipment.

"(4) Pay the agent the following commissions, based on less than carload sales and transfers. . . ."

The contract then stipulates the commissions the agent shall receive for selling the company's products, and provides that: "This agreement shall continue in full force and effect until terminated by either party. . . .

This agreement shall not be binding upon the Texas Company until approved and signed on behalf of the Texas Company by an exective officer, sales manager, assistant sales manager, or district manager."

Among the facilities owned and used by Glenn in the distribution of the appellant's products was an automobile truck on which were painted the words "Texaco" or "Texaco Petroleum Products and H. L. Glenn, Agent." The appellee was employed by Glenn to assist him, one of his duties being to drive this truck in making delivery of the appellant's products sold by Glenn. In August, 1932, the appellant and Glenn agreed to terminate this contract, and Duncan agreed to succeed Glenn under a similar contract. Thereupon Green, an auditor of the appellant, was sent to the plant by the appellant for the purpose of checking Glenn out and Duncan in, carrying with him a contract identical with Glenn's for Duncan's signature. Green finished checking the bulk sales plant itself on August 15th, and relieved Glenn of further responsibility therefor. On the next day, August 16th, Duncan's contract was executed, and, according to the appellant, he then assumed control of the business. The appellant, through Glenn, had furnished some of its customers in the territory supplied by this sales station with tanks in which to store the products sold them by Glenn. These tanks had not been checked by Green on August 16th, but were thereafter, the check being completed on August 20th, and Duncan then receipted the appellant therefor. Duncan purchased from Glenn among other things, the truck here in question, and contracted, according to the evidence for the appellant, with the appellee to work for him under the terms of his employment by Glenn. The appellee continued to drive the truck, and on August 20th, in returning to the station after making a delivery of the appellant's products therewith, the truck skidded, overturned, and injured him;

the cause thereof, according to the appellee, being a defective steering gear and brake. The appellee testified in his own behalf and did not specifically deny the appellant's evidence in reference to his employment by Duncan, but he did say that, in driving the truck after August 16th, he was acting under the direction of the appellant's auditor. The appellee knew that Glenn had been relieved of responsibility for the business, but said that, pending the completion of his check thereof the auditor told him to continue to drive the truck and make deliveries; and on complaint by appellee that the truck was defective, the auditor paid the expense of a slight repair thereto, and said that another truck would be furnished if necessary.

One of the rulings of the court below complained of by the appellant is its refusal to direct the jury to return a verdict for it. In support of this complaint, the appellant says that the evidence does not disclose that Green was authorized to employ the appellee for the appellant, and, while conceding that the appellee was employed by Duncan, says that Duncan, under his contract with the appellant, was an independent contractor, and, therefore, his employees were not the appellant's servants. The appellee denies that Green was without authority to employ him, and also denies that Duncan was an independent contractor, and while insisting that he was employed by Green, says that whether he was employed by Duncan or Green was immaterial, for, in either event, he became the appellant's servant.

We will place on one side the appellee's claim that he was employed by Green, for, as the appellant admits that the appellee was employed by Duncan, then it must be charged with whatever relation that employment created between it and the appellee. If Duncan was an independent contractor, his employment of the appellee created no contractual relation between the appellee and the appellant.

The words "independent contractor" are used in contrast with the word "servant" and not with the word "agent;" for both an independent contractor and a servant are agents of their principal. Rest. Agency, sec. 2, comment b; 1 Mechem on Agency (2 Ed.), sec. 40.

"(2) A servant is a person employed by a master to perform service in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right to control by the master.

"(3) An independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking." Rest. Agency, sec. 2, pars. 2 and 3, p. 11.

These definitions are supported by numerous decisions of this court. The matters of fact to be taken into consideration in determining whether one acting for another is a servant or an independent contractor are set forth in section 220, Rest. Agency, and in numerous decisions of this court, particularly Kisner v. Jackson, 159 Miss. 424, 132 So. 90.

Among these matters of fact are:

"(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

"(b) whether or not the one employed is engaged in a distinct occupation or business: . . .

"(d) the skill required in the particular occupation.

"(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work.

"(f) the length of time for which the person is employed.

"(g) the method of payment, whether by the time or by the job.

"(h) whether or not the work is a part of the regular

business of the employer." Rest. Agency, sec. 220, p. 483.

One of Duncan's duties, under his contract, was to bring about contractual relations between the appellant and the persons to whom he might sell the appellant's products. But he was also charged with the performance of other duties. Among these were, to receive, store, care for, and deliver the appellant's products to the purchasers thereof. The premises on which the appellant's products were to be stored belonged to it; the business in which Duncan engaged, under his contract, was not distinct from that of the appellant, but was one of the methods pursued by it in carrying on its own business; the discharge of Duncan's duties required no particular skill, but only that which most men of common sense possess; he was employed for an indefinite time; his contract stipulates that his "duties are hereby fixed by this agreement, the rules and practices of the company, and by instructions issued by the company from time to time;" obligates him to "strictly observe and obey the company's instructions," thereby subjecting him to the appellant's control with respect to his physical conduct in the performance of his duties (Singer Mfg. Co. v. Rahn, 132 U. S. 518, 10 S. Ct. 175, 33 L. Ed. 440); and authorized the company to discharge him at its pleasure.

If Duncan's contract had constituted him a mere salesman of the appellant's products without any of the other duties hereinbefore set forth, the fact that his compensation was a commission on sales would have been an important element in determining his relation to the appellant; but it is of no consequence here, and is not inconsistent with the relation of master and servant.

It is true that Duncan was required to furnish trucks and other instrumentalities necessary for the performance of his duties when not furnished by the appellant, and that the appellant furnished him with no trucks, and that he used his own. He also furnished his own as-

sistants. But these two facts are not inconsistent with the relation of master and servant. Caver v. Eggerton, 157 Miss. 88, 127 So. 727; Rest. Agency, sec. 220, par. h. It seems clear, therefore, that Duncan was not an independent contractor, but was the appellant's servant. Duncan's relation to the appellant is material, for the reason that the relation of his employees to the appellant is affected thereby.

What was the relation between the appellant and Duncan's employees? If, when discharging the duties which Duncan owed the appellant, they were subject to the appellant's control as to the details of their work, they were, when discharging such duties, servants of the appellant. Rest. Agency, sec. 227; New Orleans, etc. Co. v. Norwood, 62 Miss. 565, 52 Am. Rep. 191; Sawmill Const. Co. v. Bright, 116 Miss. 491, 77 So. 316; Yazoo & M. V. R. Co. v. Denton, 160 Miss. 850, 133 So. 656; Denton v. Yazoo, etc. Co., 284 U. S. 305, 52 S. Ct. 141, 76 L. Ed. 310. Duncan's contract does not expressly provide for such control, but it is necessarily implied by the provision therein placing Duncan himself under the appellant's control. Callahan Const. Co. v. Rayburn, 110 Miss. 107, 69 So. 669; 1 Labatt's Master and Servant (2 Ed.), sec. 40. In Gulf Refining Co. v. Nations, 167 Miss. 315, 145 So. 327, the agent and his employees were held to be the servants of the agent's principal, although the contract creating the agency did not expressly place the agent under his principal's control with reference to the details of his work. Compare Texas Co. v. Brice (C. C. A.), 26 F. (2d) 164, and Ellis v. Associated Industrial Ins. Corporation (C. C. A.), 24 F. (2d) 809.

But it is said by the appellant that this court held otherwise in Rogers v. Lewis, 144 So. 373, wherein this appellant was a party and the contract under consideration was, practically identical with the one here. If the Rogers case is in conflict herewith, we would not adhere to it; but it is not necessary for us to determine that ques-

tion, for the record in that case discloses one fact that is not here present which may distinguish it from this case, as to which we will not express an opinion until a case arises wherein that fact appears. In that case the premises on which the appellant's products were stored, and from which they were distributed by its agent, belonged to the agent and not to the appellant, while here such premises were the property of the appellant, and not of the agent.

This brings us to the final question in this connection, which is: Was the appellant, under Duncan's contract with it, relieved of any obligation to furnish the persons employed by Duncan to assist him in the discharge of his duties, with a truck for use therein, and to exercise reasonable care to keep it in safe condition?

The master's duty to furnish his servants with safe instrumentalities with which to do their work is not a contractual, but a common-law, duty, which the master cannot delegate to another. The one exception, if exception it be, to this rule, is that a servant injured by a defect in an instrumentality which he himself had contracted to furnish, or which he himself had contracted to keep in repair, relieves the master of any duty to him relative thereto. Hegwood v. J. J. Newman Lbr. Co., 132 Miss. 487, 96 So. 695; Hooks v. Mills, 101 Miss. 91, 52 So. 545; Waterman-Fouke Lumber Co. v. Miles, 135 Miss. 146, 99 So. 759; Edward Hines Lbr. Co. v. Dickinson, 155 Miss. 674, 125 So. 93. But this exception has no place here. As hereinbefore pointed out, the persons employed by Duncan to assist him in the discharge of his duties to the appellant became the appellant's servants, subject to its direction and control, to which relation the law annexes a duty on the part of the appellant to furnish and keep in repair the instrumentalities with which they must do the work which the contract authorized the appellant to require of them. While Duncan, was obligated to the appellant to furnish these instrumentalities and to keep

them in repair, his failure to do so would not relieve the appellant of its duty, in this respect to the servants employed for it by Duncan. It may be true that Duncan's employees remained his servants, but, as hereinbefore stated, when he placed them in the service of the appellant, they became also its servants and thereby became entitled to all the rights of a servant against the appellant (Rest. Agency, sec. 517), except the right to payment for their services, that obligation remaining with Duncan.

The court below committed no error in refusing to direct a verdict for the appellant.

The court below refused the appellant's request to charge the jury that Green was without authority "to control or instruct plaintiff as to the manner of the performance of his duties," and submitted to the jury the question of Green's authority to employ the appellee. These rulings become immaterial in the light of what we have hereinbefore said, for the reason that it will appear therefrom that on the appellant's admission that the appellee was employed by Duncan, the appellee was entitled, had he requested it, to an instruction directing the jury to find that he was the appellant's servant.

Duncan testified for the appellant, and, on cross-examination, over the objection of the appellant, was permitted to say that Chipley, another employee of his, drove this truck some weeks after the appellee was injured while driving it, and ran into a wagon. What caused it to run into the wagon did not appear. This evidence should not have been admitted, but we are not called upon to say whether it was sufficiently harmful to require a reversal of the case, for the reason that Chipley himself afterwards testified and rendered it harmless by stating that the cause of his running into the wagon was not a defect in the brake or steering gear of the truck, but became of his driving the truck at night with only one light.

Affirmed.