FAVRE v. LOUISVILLE & N. R. Co.

(Division B. Jan. 24, 1938. Suggestion of Error Overruled, Feb. 21, 1938.)

[178 So. 327. No. 32973.]

844

**Gex & Gex,** of Bay St. Louis, **Brunini & Hirsch** and **W. W. Ramsey,** all of Vicksburg, and **Bidwell Adam,** of Gulfport, for appellant.

848

**Smith & Johnston**, of Mobile, Ala., for appellee:

Argued orally by **W. W. Ramsey** and **W. J. Gex, Jr.**, for appellant, and by **Harry H. Smith**, for appellee.

**Griffith, J.**, delivered the opinion of the court.

.J. R. Still was, at the time of his death, a resident of Nashville, Tenn. He had never resided in Mississippi. He was killed at Wales, Tenn., while employed by appellee railroad company in interstate transportation. It was stated before us in the oral argument by appellant that the decedent had no personal property in Mississippi at the time of his death, other than the cause of action for his alleged wrongful death under the Federal Employers' Liability Act, which belongs to an administrator. Appellant Favre, the circuit clerk of Hancock county, in this state, was nevertheless appointed administrator of the estate of Still, and as such administrator instituted this action in that county. In view of the

fact that it has often been held that when a party brings a suit respecting which he has no legal or equitable right or interest, and that when this is made to appear, there is no case in court; and in view of the statement made before us in the argument as aforesaid, we called for additional briefs upon the question whether under section 1629, Code 1930, taken in connection with section 1628, an administrator could be appointed in this state for a nonresident decedent who had no personal property here other than an alleged cause of action for death, the cause of action having accrued in another state.

Attention is called to the fact that our statute for the appointment of an administrator does not include assets, as is the case in many if not most states, but speaks of personal property, and we call attention to the definition of personal property as set forth in section 1382, Code 1930. But even if the term personal property were broad enough to include assets, we cite the following cases, which, among others, seem to hold that a claim for damages growing out of the death of a nonresident killed in the state of his residence is not such an asset as will authorize the appointment of an administrator in another state. Mercer v. Dobbyn, 91 Ind. App. 682, 173 N. E. 338; Berry v. Rutland R. Co., 103 Vt. 388, 154 A. 671; Hall's Adm'r v. Louisville & N. R. Co., 102 Ky. 480, 43 S. W. 698, 80 Am. St. Rep. 358. For reasons which it is not necessary to pursue, we have determined that the record is not in such attitude that we can definitely pass on the stated question, but refer to it as above that it may be understood that the question is left open for decision when it may subsequently arise in a proper manner.

The action having been instituted in Hancock county wherein the appellant Favre is circuit clerk, the appellee railroad filed its petition for a change of venue, alleging therein that because of the fact that the administrator, who is plaintiff in the action, is the same person who is chancery and circuit clerk of the county, appellee could not obtain a fair and impartial trial therein.

There were other allegations in the petition, but not enough to fully comply with the statute on the subject. The affidavit annexed to the petition was defective in one of its formal parts. It is admitted that the court sustained the petition and entered the order changing the venue, without hearing any evidence, all over the objection of appellant.

Appellant contends that for the reasons above briefly stated, the transfer to the other county was absolutely void; that the court to which the case was removed was wholly without jurisdiction; that the judgment for appellee subsequently entered upon the trial on the merits is without any legal validity or existence; and that, therefore there is properly nothing before us on this appeal except the issue of reversal and remand to the original county. As authority for his contention, appellant relies on Wilson v. Rodewald, 49 Miss. 506. In that case the change of venue was by consent, without petition or evidence. In the case here before us there was a petition, and unless it can be said to be so void of substance that it could not be cured by amendment, it cannot be pronounced a nullity. Dalton v. Rhodes Motor Co., 153 Miss. 51, 53, 120 So. 821. It was amendable, both the petition and the affidavit, to say the least of it. And as to the evidence, the court can and does take judicial knowledge of who is its clerk, and the court evidently considered the fact that the clerk of the court was plaintiff, although in a trust capacity, was sufficient for the change of venue. If this was insufficient, the change of venue was error, but there was nevertheless sufficient in substance in that of which the court could take judicial knowledge to prevent the order for the change of venue from being absolutely void.

Upon the completion of the trial, the court granted a peremptory instruction of no liability, and, in view of the foregoing observations, we must now proceed to the merits and consider whether that action by the court was correct.

Appellant's decedent was employed, on the day of the injury and death, as a brakeman. He had been employed on this division for many years. The train was being switched, and the decedent was riding on the side of a box car with his feet in the stirrup provided for that purpose, and holding with both hands the side handholds or grabirons. In passing a cattle guard decedent was struck by it, was knocked from the car, and was killed. Appellant contends that there was not sufficient clearance between the cattle guard and the side of the freight car to permit a brakeman riding on the side of the car to pass safely by the cattle guard.

Appellee railroad company contends that the cattle guard was constructed in accordance with and in conformity to the standard for cattle guards which had been prescribed by its engineering department for twenty years, throughout the hundreds upon hundreds of miles of its railroad system into and across several states; and that in all those years no accident, other than this, had ever occurred on account of its cattle guards. Appellee contends that this is an end of the matter and cites two comparatively recent cases in which the federal Supreme Court has said: "Carriers, like other employers, have much freedom of choice in providing facilities and places for the use of their employees. Courts will not prescribe the space to be maintained between tracks in switching yards, nor leave such engineering questions to the uncertain and varying opinions of juries." Toledo, etc., R. Co. v. Allen, 276 U. S. 165. 170, 48 S. Ct. 215, 217, 72 L. Ed. 513. "Defendant was not bound to maintain its yard in the best or safest condition; it had much freedom in the selection of methods to drain its yard and in the choice of facilities and places for the use of its employees. Courts will not prescribe standards in respect of such matters or leave engineering questions such as are involved in the construction and maintenance of railroad yards and the drainage systems therein to the uncertain and varying judgment of

juries.'' Delaware, etc. R. Co. v. Koske, 279 U. S. 7, 11, 49 S. Ct. 202, 204, 73 L. Ed. 578.

Although in interstate railroad cases of injuries to employees we must follow the decisions of the federal Supreme Court, whether they seem to us right or wrong, we do not think the Supreme Court meant to say by the broad language above quoted that .when a railroad system adopts an engineering plan for its ways and appliances,· and when the particular way or appliance in question is shown to be in substantial conformity therewith, no further question is to be considered in respect · thereof. We must believe that they meant that when the particular way or appliance is one which may be used·with reasonable safety by an employee who is using the same in the usual, ordinary, or normal manner in and for which the use was designed or intended, then the employer has complied with its legal obligations in that respect, even though a better or safer appliance or way might have been furnished. They did distinctly mean to hold, as we think, that an employer is not bound to provide means and appliances of such character that no possible injury could occur in the use thereof, and this regardless of the manner of the use by the employee.

So construing the federal decisions they would be brought in harmony with the rules of the common law as generally declared and as we have ourselves held. We have repeatedly held that when the master has provided a reasonably safe method or means of doing certain work and the servant elects to use different and dangerous methods, he cannot recover for the reason that such acts become the negligence of the servant and not of the master. Stokes v. Adams-Newell Lbr. Co., 151 Miss. 711, 715, 118 So. 441, and the cases therein cited. This principle was more full stated in Newell Cont. Co. v. Flynt, 172 Miss. 719, 728, 161 So. 298, 301, 743, as follows: ''The law is that the master is as much entitled to expect that a servant will exercise reasonable care in the use and operation of a tool or appliance in the normal

manner to avoid injury as the servant is entitled to expect that the master will use reasonable care to furnish him a reasonably safe tool or appliance. . . . When the law speaks of reasonable safety in a tool or appliance, or in a place to work, it means one which can be safely employed when the servant takes reasonable care in its normal use or operation. If this were not so, nearly all modern labor-saving and time-saving devices would be condemned; and danger, not practicalities, would become the controlling test, which is not the law. . . . If danger were the test, which fortunately it is not, the fresno would have to be discarded for the shovel and the hoe, railroad trains and motor-trucks would be prohibited, and we would return to the days of the ox wagon and the cart.''

The question for decision is, therefore, whether there was sufficient clearance between the cattle guard here in issue and the side of the freight car upon which the deceased was riding to allow decedent to safely pass the cattle guard had he been holding himself upon and alongside the side of the car in the usual, ordinary, normal, or professional like manner; the manner in which the employer in designing, furnishing, erecting and maintaining its ways and appliances had a right to expect him to act.

Shortly after the accident the railroad company procured a freight car admitted to have been of the exact dimensions and construction throughout as was the car upon which decedent was riding. This car was spotted on the same track with the stirrup and handholds exactly opposite the middle of the cattle guard here in issue; it being undisputed that the cattle guard was then and has since remained in exactly the same position and in every material respect exactly in the same condition as on the date of the accident. A railroad trainman of the same size, weight, and height as decedent took his position with his feet in the stirrup and both hands holding to the handholds or grabirons and

with his body held in the proper position according to the usual, ordinary, and normal manner in railroad practice, and thereupon a photographic camera was placed at the distance apparently of about a car's length and immediately alongside the train of cars, and there a photograph was taken of the physical situation aforesaid, which photograph was introduced in evidence, and is now before us by special order of the trial judge.

This photograph is so manifestly a clear and almost perfect reproduction, down to the slightest material detail, and is so obviously taken from the proper camera position as that we may say, with entire confidence, that it amounts to a conclusive demonstration of the physical facts as disclosed by it. Compare Mobile, etc., R. Co. v. Bryant, 159 Miss. 528, 536, 132 So. 539. In fact, appellant makes no attempt to discredit the truth and integrity of this photograph, except to say that it ought to have been taken with the train in motion; a contention which is so manifestly not tenable that appellant has not seriously pressed it.

Looking to this photograph and to the position of the trainman, which position was admitted by every witness of railroad experience, who was questioned, to be the correct position according to the usual and normal in practice among railroad employees, we see at once that only about one-half the space between the car and the cattle guard was occupied by the body of the trainman, and that the clearance was ample, so much so that there is not here involved any nicety of calculation as to a few inches, as contended for by appellant. The only eyewitness to the accident testified that the decedent was holding onto the car with both hands. Appellant has invited us to consider, however, that in spite of this testimony of the only eyewitness, the decedent was holding on with one hand and signaling with the other. Even so, and looking again to the photograph, it is plain that if standing in the correct and normal position and sig-

naling with one hand, there would still have been sufficient, even ample, clearance.

The only eyewitness was introduced by appellant. This witness testified, as we have already mentioned, that the decedent was holding onto the car with both hands, and the witness made a demonstration before the trial court as regards the position of the body of the decedent at the time he struck the cattle guard. The manner of this demonstration, what the demonstration showed, is not disclosed by the transcript. Inasmuch as the decision and judgment of the trial court is presumed to be correct, and where material evidence produced in the trial is not reproduced here in such a manner that we can tell what it was, we must assume that it was of such character as to sustain the decision and judgment; and we might well rest the case at this point. But this witness on cross-examination went on to explain that decedent was not standing with his body straight or nearly so, but that he was riding with his hips or the middle part of his body bent out and away from the car, and to such an extent that this was the part of his body which struck the cattle guard.

This eyewitness had made a statement to the railroad company to the same effect before the taking of the photograph above mentioned. Therefore, on the same occasion, with the same equipment, and with the same trainman, another photograph was taken with the trainman holding on with both hands but to the handhold next lower than either one of the two upper handholds which the decedent should have used in the proper and normal use, and this photograph shows that the hips of the trainman in that awkward, unnatural, and abnormal position protruded so far away from the car as to come squarely in contact with the cattle guard, and would have come in contact with it even if it had had eight to ten inches more clearance space, as appellant contends should have been provided. In the light of the testimony of the eyewitness, the conclusion seems ines-

capable that this was the manner in which decedent was riding and was what caused his unfortunate accident; that the deceased elected to use an unsafe and dangerous way, an unusual or abnormal way, instead of the normal and safe way readily and easily within his reach and use; whence it follows that, applying the facts to the principles of law already stated, there is no liability on the part of the employer, and the learned trial court was correct in so holding.

What we have said renders it unnecessary to discuss the issue of assumption of risk, or the other matters so ably presented in argument.

Affirmed.